**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Derek N. Foster, | : | Case No. 5:13 CV 284 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
| Defendant, | : | **RECOMMENDATION** |

**I. INTRODUCTION**

Plaintiff Derek N. Foster ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying his claim

for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C.

§1381 (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 13 and 14) and

Plaintiff's Reply (Docket No. 15). For the reasons that follow, the Magistrate recommends that the

opinion of the Commissioner be affirmed.

**II. PROCEDURAL BACKGROUND**

On August 27, 2009, Plaintiff filed an application for SSI under Title XVI of the Social

Security Act, 42 U.S.C. § 1381, alleging a period of disability beginning October 22, 2006 (Docket

1

No. 12, p. 119 of 434).[1] Plaintiff's claim for SSI was denied initially on January 20, 2010 (Docket No. 12, p. 72 of 434), and upon reconsideration on June 24, 2010 (Docket No. 12, p. 80 of 434). Plaintiff thereafter timely filed a written request for a hearing on August 3, 2010 (Docket No. 12, p. 84 of 434).

On June 24, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Hilton R. Miller ("ALJ Miller") (Docket No. 12, pp. 42-68 of 434). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 12, pp. 45-46, 64-68 of 434). ALJ Miller found Plaintiff to have a severe combination of other and unspecified anthropathies and an affective disorder with an onset date of August 27, 2009[2] (Docket No. 12, p. 27 of 434).

Despite these limitations, ALJ Miller determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the application date through the date of his decision (Docket No. 12, p. 35 of 434). ALJ Miller found Plaintiff had the residual functional capacity to perform medium work, as defined in 20 C.F.R. § 416.967(c), with the following exceptions:

1.  Plaintiff may stand and/or walk, with normal breaks, for up to two hours during an eight-hour workday

2.  Plaintiff may sit, with normal breaks, for up to six hours during an eight-hour workday

3.  Plaintiff may never climb ladders, ropes, or scaffolds, or operate foot controls or pedals

4.  Plaintiff is limited to the performance of work tasks that are simple, repetitive, and

_____

[1] Plaintiff also filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 12, p. 115 of 434). His claim was dismissed on December 28, 2010, due to insufficient coverage (Docket No. 12, p. 125 of 434).

[2] Plaintiff initially alleged an onset date of October 22, 2006 (Docket No. 12, p. 119 of 434). However, during the administrative hearing, Plaintiff admitted to participating in substantial gainful activity during throughout 2006 and 2007 (Docket No. 12, p. 49 of 434).

routine, which take place in a relatively static environment with no high- or fast-paced production quotas

5.      Plaintiff may only work in an environment in which changes can be explained and which only involves brief and superficial contact with the public

(Docket No. 12, p. 29 of 434). ALJ Miller found Plaintiff unable to perform any of his past relevant work but able to do other work in the national economy (Docket No. 12, p. 34 of 434). Plaintiff's request for benefits was therefore denied (Docket No. 12, p. 35 of 434).

On February 9, 2013, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of his denial of SSI (Docket No. 1). In his pleading, Plaintiff alleged the ALJ failed to properly: (1) apply the treating physician rule; (2) evaluate Plaintiff's credibility; and (3) determine Plaintiff's ability to perform other work in the national economy (Docket No. 13). Defendant filed its Answer on May 17, 2013 (Docket No. 11).

### III. FACTUAL BACKGROUND

**A.      THE ADMINISTRATIVE HEARING**

An administrative hearing convened on June 24, 2011, in Akron, Ohio (Docket No. 12, pp. 42-68 of 434). Plaintiff, represented by attorney Diane Newman, appeared and testified (Docket No. 12, pp. 44, 46-64 of 434). Also present and testifying was VE Kevin Z. Yi ("VE Yi") (Docket No. 12, pp. 45-46, 64-68 of 434).

**1.      PLAINTIFF'S TESTIMONY**

At the time of the hearing, Plaintiff was a forty-eight year old male who resided with his mother (Docket No. 12, pp. 46, 52 of 434). Plaintiff attended school through the tenth grade and later earned his GED (Docket No. 12, p. 51 of 434). He has never been married but has three adult children (Docket No. 12, p. 51 of 434). Plaintiff testified that his current sources of income included public

3

assistance, food stamps, and help from family and friends (Docket No. 12, p. 50 of 434).

Plaintiff has a lengthy criminal history, and stated he had been arrested between forty and fifty times and charged with everything from "jaywalking to rape" (Docket No. 12, p. 52 of 434). Plaintiff has been convicted twenty to twenty-five times, and has spent seven months in prison and a total of three years in jail, with his longest stay being between ninety and 120 days (Docket No. 12, pp. 52-54 of 434). Plaintiff testified that his most serious conviction was for assault without a weapon (Docket No. 12, p. 54 of 434). Plaintiff also has a lengthy alcohol and substance abuse history, with prior binge drinking and cocaine and marijuana use (Docket No. 12, pp. 54-55 of 434). Plaintiff testified that he has been clean since 2001, but last drank only a few weeks before the hearing (Docket No. 12, p. 55 of 434).

Plaintiff testified his previous work included positions as a telemarketer, temporary laborer, and commercial truck driver (Docket No. 12, pp. 47-48 of 434). Although Plaintiff stated he last worked in October 2006, Plaintiff later admitted that he worked "sporadically" for his uncle rehabilitating and cleaning up houses throughout 2006 and 2007 (Docket No. 12, p. 49 of 434). When asked, Plaintiff stated his main problem in returning to work was the pain in his knees and feet (Docket No. 12, p. 52 of 434).

Plaintiff's testimony with regard to his alleged impairments mostly focused on his depression. Plaintiff stated he was receiving treatment for depression because he was "falling apart" (Docket No. 12, p. 56 of 434). He had no energy and was always tired (Docket No. 12, p. 56 of 434). Plaintiff testified that he sees a therapist at Portage Path Behavioral Health ("Portage Path") once a month and has a psychiatrist to monitor his depression medication (Docket No. 12, pp. 56-57 of 434). He stated that when he is on his medication, he feels better and can do light duty work around the house (Docket

4

No. 12, p. 58 of 434).

With regard to his residual functional capacity, Plaintiff stated that he cuts the grass (Docket No. 12, p. 58 of 434), goes grocery shopping (Docket No. 12, p. 60 of 434), cooks his own meals, does his own laundry, changes his sheets, vacuums the house twice per week, and shovels snow (Docket No. 12, pp. 62-63 of 434). Plaintiff stated that he uses a cane but can walk for fifteen to twenty minutes without it (Docket No. 12, p. 59 of 434). He can also stand for a total of ten to fifteen minutes (Docket No. 12, pp. 59-60 of 434). Plaintiff stated that he does not have any difficulty sitting, but often spends four to five hours per day lying down (Docket No. 12, p. 61 of 434).

## 2.    VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as a truck driver as semi-skilled and medium, as a general laborer as unskilled and medium, and as a telemarketer as semi-skilled and sedentary (Docket No. 12, p. 64 of 434).

ALJ Miller then posed his first hypothetical question:

For the first hypothetical, please consider a hypothetical individual of the claimant's age, education, work experience and the residual functional capacity to lift and/or carry up to [fifty] pounds occasionally, [twenty-five] pounds frequently; stand and/or walk with normal breaks for a total of about two hours in an eight hour workday; sit with normal breaks for a total of about six hours in an eight hour workday; no ladders, ropes, or scaffolds; no foot controls or pedals; and non-exertional limitations to work that is simple, routine and repetitive in a relatively static work environment that does not involve high or fast paced production quotas where changes can be explained and involving only brief and superficial contact with the public. With these limitations, would there be any jobs?

(Docket No. 12, pp. 64-65 of 434). Taking into account these limitations, the VE testified that such an individual would not be able to perform Plaintiff's past relevant work but could perform other work in

5

the national economy, including: (1) business address clerk, listed under DOT[3] 209.587-010, for which

there are 25,000 positions nationally and 1,000 in the State of Ohio; (2) telephone answering service

clerk, listed under DOT 237.367-46[], for which there are 80,000 positions nationally and 4,000 in the

State of Ohio; and (3) final assembler, listed under DOT 713.687-018, for which there are 25,000

positions nationally and 1,000 in the State of Ohio (Docket No. 12, p. 65 of 434). VE Yi testified that,

of the positions available in the State of Ohio, approximately one-quarter or one-fifth of those

positions were located in northeast Ohio (Docket No. 12, p. 66 of 434).

> During cross examination, Plaintiff's counsel posed the following hypothetical question:
>
> I'd like you to assume an individual who can lift only [ten] pounds frequently and occasionally and who can stand for two hours; sit for six hours; who needs a cane for any standing or walking of more than [fifteen] minutes; no foot controls; the same limitations that the Judge gave you as to simple, routine, repetitive work; and in addition, this individual would have an [eleven to twenty] percent limitation on his ability to complete a normal workday and workweek without psychologically based symptoms to interrupt him. Would that individual be able to do any of these jobs, the three, the business address clerk, the telephone answering clerk, and the final assembler?

(Docket No. 12, pp. 66-67 of 434). The VE indicated that this combination of limitations was work-

preclusive (Docket No. 12, p. 67 of 434).

## B.   MEDICAL RECORDS

### 1.   PHYSICAL HEALTH ISSUES

Plaintiff's medical records dealing with his physical health issues date back to January 29,

2009, when radiology scans of Plaintiff's left knee showed severe narrowing of the medial

compartment with spurring sclerosis along the medial articular margins over the knee joint (Docket

No. 12, p. 226 of 434). Plaintiff was diagnosed with severe degenerative joint disease (Docket No. 12,

---

[3] Dictionary of Occupational Titles.

6

p. 226 of 434). On that same day, Dr. Walid Behnawa, MD ("Dr. Behnawa") evaluated Plaintiff at the request of the Bureau of Disability Determination ("BDD") (Docket No. 12, pp. 223-25 of 434). During the examination, Plaintiff reported a burning sensation in his foot and some tingling while walking and standing (Docket No. 12, p. 223 of 434). Plaintiff also stated that his knee pain was exacerbated by movement, including standing, be nding his knees, walking, and going up stairs (Docket No. 12, p. 223 of 434). Plaintiff treated both of these impairments with an occasional Tylenol (Docket No. 12, p. 223 of 434). Dr. Behnawa found Plaintiff's extremities had a full range of motion, but noted some crepitus in his left knee, along with pain upon palpation (Docket No. 12, p. 224 of 434). In a Manual Muscle Testing Evaluation, Dr. Behnawa found no abnormalities in Plaintiff's abilities or range of motion (Docket No. 12, pp. 227-30 of 434).

Plaintiff's physical health records then jump to October 7, 2009, when Plaintiff saw Dr. Randall Castor, MD ("Dr. Castor"), again at the request of the BDD (Docket No. 12, pp. 265-66 of 434). Plaintiff still complained of pain in both his knees and feet, rating the pain at a level nine and eight out of a possible ten, respectively (Docket No. 12, p. 265 of 434). Plaintiff also complained of right shoulder pain, which he rated at a level seven (Docket No. 12, p. 265 of 434). Plaintiff stated he smoked half a pack of cigarettes and drank a six-pack of beer every day (Docket No. 12, p. 266 of 434). Dr. Castor noted that Plaintiff was able to drive and did not use a cane or other assistive device (Docket No. 12, p. 266 of 434). When asked, Plaintiff stated he could walk two blocks, stand for ten minutes, sit for thirty minutes, and lift five to ten pounds (Docket No. 12, p. 266 of 434). Plaintiff also reported that he was able to bathe and dress himself, as well as cook and clean (Docket No. 12, p. 266 of 434). Plaintiff stated he took Advil and Tylenol on an as-needed basis (Docket No. 12, p. 266 of 434).

Upon examination, Dr. Castor found Plaintiff had good strength bilaterally in both his upper and lower extremities (Docket No. 12, p. 266 of 434). He also had full range of motion in all his extremities, although there was some laxity in his knee ligaments bilaterally (Docket No. 12, p. 266 of 434). Plaintiff had a slight limp, but was able to touch his toes and get up and down from the examining table without assistance (Docket No. 12, p. 266 of 434). Dr. Castor diagnosed Plaintiff with chronic bilateral knee pain, plantar fasciitis, and right shoulder pain (Docket No. 12, p. 266 of 434). Radiology scans taken on the same day revealed extensive degenerative changes in Plaintiff's left knee (Docket No. 12, p. 268 of 434). Again, Plaintiff had a normal Manual Muscle Testing Evaluation (Docket No. 12, pp. 269-72 of 434).

On October 20, 2009, following radiology testing, Plaintiff was diagnosed with tri-compartmental degenerative changes in both knees (Docket No. 12, p. 285 of 434). On October 29, 2009, scans of Plaintiff's feet yielded normal results (Docket No. 12, p. 286 of 434). On January 29, 2010, Plaintiff was seen at the St. Thomas Hospital Orthopedic Clinic ("St. Thomas") by Dr. Matthew Kay, MD ("Dr. Kay") (Docket No. 12, p. 357 of 434). Dr. Kay diagnosed Plaintiff with osteoarthritis of both knees, the left more severe than the right (Docket No. 12, p. 357 of 434). Plaintiff underwent a corticosteroid injection and was sent for physical therapy (Docket No. 12, p. 357 of 434). Plaintiff returned to St. Thomas on March 12, 2010, and reported that he experienced relief from the injection, but it only lasted four weeks (Docket No. 12, p. 356 of 434). He stated that he took Motrin as needed, but not on a daily basis (Docket No. 12, p. 356 of 434). Plaintiff never followed through with the ordered physical therapy (Docket No. 12, p. 356 of 434). Plaintiff had a second steroid injection in his left knee on June 18, 2010 (Docket No. 12, p. 397 of 434). On January 26, 2011, radiology scans showed severe bilateral degeneration in Plaintiff's knees (Docket No. 12, p. 419 of 434).

**2.      MENTAL HEALTH ISSUES**

Plaintiff has a long history of sporadic mental health treatment. On July 15, 1998, Plaintiff was referred to Portage Path by the Crisis Stabilization Unit (Docket No. 12, p. 220 of 434). Plaintiff reported that he went to Psychiatric Emergency Services after allegedly almost killing a man who stole $600 from him (Docket No. 12, p. 220 of 434). Plaintiff admitted that he had been drinking and using drugs (Docket No. 12, p. 220 of 434). Upon examination, Plaintiff was found to be oriented times three and without psychosis (Docket No. 12, p. 220 of 434). He was diagnosed with substance-induced mood disorder and referred to the Community Drug Board (Docket No. 12, pp. 220-21 of 434).

Plaintiff returned to Portage Path more than a decade later on February 17, 2009, complaining of depression, lack of energy, mood swings, and disinterest in activities (Docket No. 12, p. 328 of 434). Plaintiff also alleged thoughts of hopelessness and helplessness, but denied suicidal or homicidal ideations (Docket No. 12, p. 328 of 434). He was still smoking one pack of cigarettes per day, but reported that he last used alcohol in February 2007 (Docket No. 12, p. 329 of 434). Upon examination, Portage Path staff found Plaintiff to be neatly dressed and well-groomed (Docket No. 12, p. 331 of 434). His speech was of normal pace and intensity, his thought content was relevant and organized, his concentration, judgment, and memory were adequate, and his intelligence was average (Docket No. 12, p. 331 of 434). Plaintiff displayed a somewhat dysthymic or sad mood and his insight was moderately impaired (Docket No. 12, p. 331 of 434). Plaintiff admitted to taking himself out of mental health treatment in 2004 (Docket No. 12, p. 331 of 434). He was diagnosed with depressive disorder not otherwise specified ("NOS"), adjustment disorder, and polysubstance dependence in sustained

remission, and assigned a Global Assessment of Functioning ("GAF") of forty-eight[4] (Docket No. 12, pp. 331-32 of 434).

Plaintiff returned to Portage Path numerous times from February 2009 through February 2011, working with his primary treating psychologist Dr. Ramone Ford, Ph.D ("Dr. Ford") (Docket No. 12, pp. 326-434 of 434). Plaintiff always presented as depressed but had logical, coherent, and spontaneous thought (Docket No. 12, pp. 326-434 of 434). During a re-evaluation on February 16, 2010, Plaintiff reported that he did not have any energy and was experiencing sleep problems, along with feelings of hopelessness and helplessness (Docket No. 12, p. 333 of 434). Plaintiff also had problems concentrating and with anxiety (Docket No. 12, p. 333 of 434). Dr. Ford noted that Plaintiff's thought process was organized, linear, and concrete, and his thought content was relevant (Docket No. 12, p. 333 of 434). Dr. Ford also noted Plaintiff sometimes talked to himself, but displayed no evidence of psychosis (Docket No. 12, p. 333 of 434). Plaintiff was diagnosed with depressive disorder NOS and assigned a GAF score of fifty[5] (Docket No. 12, p. 334 of 434).

In April 2010, Plaintiff reported using marijuana two times per week and consuming alcohol several times per week (Docket No. 12, p. 366 of 434). In May 2010, Dr. Ford noted that Plaintiff displayed a low frustration tolerance (Docket No. 12, p. 390 of 434). By early 2011, Plaintiff's mood was depressed, irritable, and angry, and he had become somewhat aggressive towards others (Docket No. 12, pp. 425, 429, 431, 433 of 434). Plaintiff had only partial compliance with treatment during this

---

[4] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of forty-eight indicates serious symptoms or any serious impairment in social, occupational, or school functioning. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

[5] A score of fifty indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV at 34.

time, with eleven no-show or cancelled appointments (Docket No. 12, pp. 326-434 of 434).

## C.     EVALUATIONS

### 1.     PSYCHOLOGICAL EVALUATION

On March 5, 2009, Plaintiff underwent a Psychological Evaluation with Dr. Margaret Zerba, Ph.D ("Dr. Zerba") at the request of the BDD (Docket No. 12, pp. 233-37 of 434). Plaintiff was cooperative during the evaluation, but seemed preoccupied and lethargic (Docket No. 12, p. 234 of 434). His thought process was slow, but organized and coherent (Docket No. 12, p. 234 of 434). Plaintiff appeared depressed with a flat affect, claiming that he sometimes slept thirteen to fourteen hours per day (Docket No. 12, p. 234 of 434). He had no history of hallucinations or delusions and did not present with any evidence of psychosis (Docket No. 12, p. 235 of 434).

Plaintiff was oriented to person, time, place, and situation (Docket No. 2, p. 235 of 434). Based upon testing, his cognitive functioning was within an average range of intelligence (Docket No. 12, p. 235 of 434). Dr. Zerba noted that Plaintiff's insight seemed limited and his judgment was fair to poor (Docket No. 12, p. 235 of 434). Plaintiff reported that he drank alcohol to get drunk and stopped using illegal substances only because he could no longer afford them (Docket No. 12, p. 236 of 434).

Dr. Zerba diagnosed Plaintiff with major depressive disorder, alcohol abuse, personality disorder NOS, and assigned him a GAF score of forty-five[6] (Docket No. 12, p. 236 of 434). While Plaintiff had no limitation with regard to his ability to understand and follow directions and pay attention to perform simple, repetitive tasks, he had serious limitations in relating to others in the work environment and in his ability to withstand the stress and pressures of day-to-day work activity

---

[6] A GAF score of forty-five indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV at 34.

(Docket No. 12, p. 237 of 434).

### 2. FIRST MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On March 13, 2009, Plaintiff underwent a Mental Residual Functional Capacity Assessment with state examiner Dr. Cynthia Waggoner, Psy.D. ("Dr. Waggoner") (Docket No. 12, pp. 252-55 of 434). Dr. Waggoner found Plaintiff to be moderately limited in his ability to: (1) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (2) interact appropriately with the general public; (3) accept instructions and respond appropriately to criticism from supervisors; and (4) respond appropriately to changes in the work setting (Docket No. 12, pp. 252-53 of 434).

### 3. FIRST PSYCHIATRIC REVIEW TECHNIQUE

On the same day, Dr. Waggoner also completed a Psychiatric Review Technique for Plaintiff (Docket No. 12, pp. 238-51 of 434). Dr. Waggoner noted that Plaintiff suffered from major depressive disorder, personality disorder, and alcohol abuse (Docket No. 12, pp. 241-46 of 434). In assessing "Paragraph B" criteria,[7] Dr. Waggoner found Plaintiff to have a mild degree of limitation with regard to activities of daily living and maintaining concentration, persistence, and pace, and moderate difficulty in maintaining social functioning, with no episodes of decompensation (Docket No. 12, p. 248 of 434). Dr. Waggoner did not find the presence of any "Paragraph C" criteria[8] (Docket No. 12, p. 249 of 434).

---

[7] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[8] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

### 4.    SECOND PSYCHOLOGICAL EVALUATION

On December 23, 2009, at the request of the BDD, Plaintiff underwent a Psychological Evaluation with Dr. Sudhir Dubey, Psy.D ("Dr. Dubey") (Docket No. 12, pp. 299-304 of 434). During the evaluation, Plaintiff displayed coherent flow of conversation and thought and a logical progression of goals and ideas (Docket No. 12, p. 301 of 434). Plaintiff described his mood as angry and reported mood swings and crying spells (Docket No. 12, p. 301 of 434). He denied feelings of guilt, hopelessness, or helplessness (Docket No. 12, p. 301 of 434).

Plaintiff was oriented to person, place, time, and situation (Docket No. 12, p. 302 of 434). He showed an average level of cognitive functioning (Docket No. 12, p. 302 of 434). Dr. Dubey determined that Plaintiff was able to consistently manage his activities of daily living and was able to drive, shop, make purchases, and manage money independently (Docket No. 12, p. 303 of 434). Plaintiff was assigned a GAF score of sixty[9] (Docket No. 12, p. 303 of 434). Dr. Dubey determined that Plaintiff had no limitation with regard to his ability to: (1) understand, remember, and follow simple instructions; (2) relate to others; (3) withstand stress and pressure associated with day-to-day work activity; and (4) understand and follow complex instructions (Docket No. 12, pp. 303-04 of 434). Plaintiff's ability to maintain attention, concentration, persistence, and pace to perform simple and repetitive tasks was mildly impaired (Docket No. 12, p. 303 of 434). His ability to perform complex tasks was moderately impaired (Docket No. 12, p. 304 of 434).

### 5.    FIRST PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On April 8, 2009, Plaintiff underwent a Physical Residual Functional Capacity Assessment

---

[9] A score of sixty indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV at 34.

13

with state examiner Dr. Willa Caldwell, MD ("Dr. Caldwell") (Docket No. 12, pp. 256-63 of 434). Dr. Caldwell determined that Plaintiff could: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for a total of six hours during an eight-hour day; and (4) sit for a total of six hours during an eight-hour day (Docket No. 12, p. 257 of 434). Plaintiff could occasionally climb ramps or stairs but never ladders, ropes, or scaffolds (Docket No. 12, p. 258 of 434). He could also only occasionally kneel, crouch, and crawl (Docket No. 12, p. 258 of 434). Plaintiff had no manipulative, visual, communicative, or environmental limitations (Docket No. 12, pp. 259-60 of 434).

6.    SECOND PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff underwent a second Physical Residual Functional Capacity Assessment on December 9, 2009, with state examiner Dr. W. Jerry McCloud, MD ("Dr. McCloud") (Docket No. 12, pp. 290-97 of 434). Dr. McCloud opined that Plaintiff could: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk for a total of two hours during an eight-hour day; (4) sit for a total of six hours during an eight-hour day; and (5) engage in unlimited pushing and pulling (Docket No. 12, p. 291 of 434). Dr. McCloud also found Plaintiff could never climb ladders, ropes, or scaffolds (Docket No. 12, p. 292 of 434). Again, Plaintiff had no manipulative, visual, communicative, or environmental limitations (Docket No. 12, pp. 293-94 of 434).

7.    SECOND MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On January 14, 2010, Plaintiff underwent a second Mental Residual Functional Capacity Assessment with state examiner Dr. Todd Finnerty, Psy.D ("Dr. Finnerty") (Docket No. 12, pp. 319-22 of 434). Dr. Finnerty found Plaintiff moderately limited in his ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular

14

attendance, and be punctual within customary tolerances; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (4) respond appropriately to changes in the work setting (Docket No. 12, pp. 319-20 of 434).

### 8. SECOND PSYCHIATRIC REVIEW TECHNIQUE

On that same day, Dr. Finnerty also completed a Psychiatric Review Technique for Plaintiff (Docket No. 12, pp. 305-18 of 434). Dr. Finnerty opined that Plaintiff suffered from pain disorder with general medical and psychological factors and cocaine abuse in remission (Docket No. 12, pp. 308-14 of 434). In assessing "Paragraph B" criteria, Dr. Finnerty found Plaintiff to have a mild degree of limitation with regard to activities of daily living and maintaining social functioning and moderate difficulty in maintaining concentration, persistence, and pace, with no episodes of decompensation (Docket No. 12, p. 315 of 434). Dr. Finnerty did not find the presence of any "Paragraph C" criteria (Docket No. 12, p. 316 of 434).

### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007). DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same

definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits  . . .  physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

16

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform.  *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Miller made the following findings:

1. Plaintiff engaged in substantial gainful activity during the following periods: November 1, 2006, through December 31, 2006.

2. There has been a continuous 12-month period(s) during which Plaintiff did not engage in substantial gainful activity. The remaining findings address the period(s) Plaintiff did not engage in substantial gainful activity.

3. Plaintiff has the following severe impairments: other and unspecified anthropathies and an affective disorder.

6. Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

7. Plaintiff has the residual functional capacity to perform medium work, as defined in 20 C.F.R. § 416.967(c), except for the following limitations: (1) Plaintiff may stand and/or walk, with normal breaks, for up to two hours during an eight-hour workday; (2) Plaintiff may sit, with normal breaks, for up to six hours in an eight-hour workday; (3) Plaintiff may never climb ladders, ropes, or scaffolds, and may never operate foot controls or pedals; (4) Plaintiff is limited to the performance of work tasks that are simple, repetitive, and routine, which take place in a relatively static environment with no high- or fast-paced production quotas, in which changes can be explained, and which involves only brief and superficial contact with the public.

8. Plaintiff is unable to perform any past relevant work.

17

9.    Plaintiff was born on November 16, 1962, and was forty-six years old, which is defined as a younger individual age 18-49 on the date the application was filed.

10.    Plaintiff has at least a high school education and is able to communicate in English.

11.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational rules as a framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferable job skills.

12.    Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

13.    Plaintiff has not been under a disability, as defined in the Social Security Act, since August 19, 2009,[10] the date the application was filed.

(Docket No. 12, pp. 25-36 of 434). ALJ Miller denied Plaintiff's request for SSI benefits

(Docket No. 12, p. 35 of 434).

### VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-

33 (6th Cir. 2006). In conducting judicial review, this Court must affirm the Commissioner's

conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact

that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27

(6th Cir. 1967)). "The findings of the [Commissioner] as to any fact if supported by substantial

evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028,

---

[10] Plaintiff's SSI application was filed on August 27, 2009 (Docket No. 12, p. 119 of 434). It is believed that this date of August 19, 2009, is simply clerical error on the part of the ALJ.

1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.    PLAINTIFF'S ALLEGATIONS

In his Brief on the Merits, Plaintiff alleged the ALJ failed to properly: (1) apply the treating physician rule; (2) evaluate Plaintiff's credibility; and (3) determine Plaintiff's ability to perform other work in the national economy (Docket No. 13).

### B.    DEFENDANT'S RESPONSE

Defendant disagrees and argues the ALJ properly evaluated: (1) the opinion of Plaintiff's treating psychologist; (2) Plaintiff's credibility; and (3) Plaintiff's ability to perform other jobs in the national economy (Docket No. 14).

### C.    DISCUSSION

#### 1.    TREATING PHYSICIAN RULE

The Sixth Circuit provided a detailed summary of the treating physician rule in *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). According to the Court, the treating physician rule:

> requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).

19

> The ALJ must give a treating source opinion controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. On the other hand . . . it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *SSR* 96-2p, 1996 SSR LEXIS 9 at *5 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544.

> [T]he regulations require the ALJ to always give good reasons in the notice of determination or decision for the weight given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *SSR* 96-2p, 1996 SSR LEXIS 9 at *12.

*Blakley*, 581 F.3d at 406-07 (internal quotations omitted). Here, ALJ Miller accorded little weight to the opinion of Plaintiff's treating psychologist at Portage Path, Dr. Ford (Docket No. 12, p. 33 of 434). In a medical report submitted to the BDD on May 3, 2010, Dr. Ford noted that Plaintiff: (1) continues to have depressed mood, despite medication; (2) has memory problems, racing thoughts, and difficulty with concentration; (3) suffers from a lack of motivation, interest, and energy; (4) prefers isolation; and (5) has a low frustration tolerance, likely due to lack of sleep (Docket No. 12, pp. 389-90 of 434). Dr. Ford further noted, in a medical source assessment, that Plaintiff would have "noticeable difficulty"[11]

in numerous areas, including with his ability to: (1) understand and remember detailed instructions; (2)

---

[11] As used, "noticeable difficulty" is defined as being distracted from job activity more than twenty percent of the work day or work week (i.e., more than one hour and up to two hours/day or one-half to one day/week (Docket No. 12, p. 394 of 434).

20

carry out very short and simple instructions; (3) maintain attention and concentration for extended periods of time; (4) work in coordination with or proximity to others without being distracted by them; (5) make simple work-related decisions; (6) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (7) interact appropriately with the general public; and (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Docket No. 12, pp. 394-95 of 434). Dr. Ford also noted that Plaintiff would not be able to carry out detailed instructions (Docket No. 12, p. 394 of 434). ALJ Miller discounted Dr. Ford's opinion, citing his inconsistency with the opinions of the state examiners and even his own treatment records (Docket No. 12, p. 33 of 434).

ALJ Miller did indeed provide substantial justification for the weight assigned to Plaintiff's treating psychologist. As noted by the ALJ, while Plaintiff typically presented with a depressed mood, he always displayed a coherent and logical thought process (Docket No. 12, pp. 30-31, 326-429 of 434). On April 20, 2010, Plaintiff's condition was described as stable (Docket No. 12, pp. 31, 366 of 434). On December 17, 2010, and January 13, 2011, Dr. Ford noted that Plaintiff was making some progress towards his goals (Docket No. 12, pp. 31, 430, 432 of 434). Plaintiff is on an anti-depression medication regimen, which Plaintiff himself claimed was effective (Docket No. 12, pp. 31, 58 of 434).

Furthermore, as ALJ Miller noted, Plaintiff has reported an ability to do numerous activities of daily living, including live independently, attend to his own personal hygiene and grooming, do household chores such as vacuuming, cleaning, and laundry, cook, do yard work and shovel snow, drive, leave his home unaccompanied, and manage his own finances (Docket No. 12, pp. 31, 58-63 of 434). Of significant note is Plaintiff's mental health treatment history. Although Plaintiff has sought

21

mental health treatment several times in the past, his most recent period of service indicated eleven missed or cancelled appointments (Docket No. 12, pp. 31, 336-428 of 434).

In addition to being contrary to the weight of the evidence, Dr. Ford's opinions are not consistent with those of the state examiners. Contrary to Plaintiff's argument that Dr. Zerba, who saw Plaintiff in March 2009, found similar limitations as Dr. Ford, Dr. Zerba reported that Plaintiff had *no* limitation with regard to his ability to understand and follow directions and pay attention to perform simple, repetitive tasks (Docket No. 12, p. 237 of 434). During that same month, Dr. Waggoner found Plaintiff to be only moderately limited in his ability to: (1) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (2) interact appropriately with the general public; (3) accept instructions and respond appropriately to criticism from supervisors; and (4) respond appropriately to changes in the work setting (Docket No. 12, pp. 252-53 of 434).

In December 2009, well into Plaintiff's course of treatment with Dr. Ford, state examiner Dr. Dubey determined Plaintiff had no limitation with regard to his ability to: (1) understand, remember, and follow simple instructions; (2) relate to others; (3) withstand stress and pressure associated with day-to-day work activity; and (4) understand and follow complex instructions (Docket No. 12, pp. 303-04 of 434). Plaintiff's ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks was mildly impaired (Docket No. 12, p. 303 of 434). His ability to perform complex tasks was moderately impaired (Docket No. 12, p. 304 of 434). In January 2010, Dr. Finnerty opined that Plaintiff was only moderately limited in his ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) complete a normal workday and

22

workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (4) respond appropriately to changes in the work setting (Docket No. 12, pp. 319-20 of 434). The limitations set forth by these state examiners express, at most, a *moderate* limitation on Plaintiff's ability to do some tasks. These moderate limitations fall short of Dr. Ford's proffered "noticeable difficulty" assessment.

In assigning anything less than controlling weight to a treating physician, an ALJ is required, under Social Security regulations, to specifically state the reasons for the weight assignment in his written decision. *Wilson*, 378 F.3d at 544. ALJ Miller complied with that requirement. Not only did he cite to substantial evidence in Plaintiff's medical record, he also used the opinions of four state examiners to support his opinion (Docket No. 12, pp. 30-33 of 434). As stated above, "it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. Plaintiff's assignment of error is therefore without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

## 2. PLAINTIFF'S CREDIBILITY

Plaintiff next alleges the ALJ erred by not giving adequate consideration to his subjective allegations of pain (Docket No. 13). In his decision, ALJ Miller found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity" (Docket No. 12, pp. 29-30 of 434).

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987) (per curiam). An ALJ need not fully credit subjective complaints where there is no underlying medical basis. *Fraley v. Sec'y of Health and Human Servs.*, 733 F.2d 437, 440 (6th Cir. 1984). The Social Security Administration provides guidelines as to how an ALJ should evaluate a claimant's symptoms, including pain. Under 20 C.F.R. § 404.1529(a), the Social Security Administration considers:

> all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . We will consider all of your statements about your symptoms, such as pain, and any description you, your treating source or nontreating source, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work. However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . would lead to a conclusion that you are disabled.

20 C.F.R. § 404.1529(a). Where a claimant's subjective allegations suggest more severe symptoms than would reasonably be expected to be produced by the benign and questionable medical findings, it is the ALJ who is responsible for making credibility determinations. 20 C.F.R. §§ 404.1529(c)(1)-(4), 416.929(c)(1)-(4).

During his testimony, Plaintiff claimed that the main reason he could not return to work was the pain in his knees and feet (Docket No. 12, p. 52 of 434). He also testified that he cannot stand for more than ten to fifteen minutes (Docket No. 12, p. 59 of 434), walk without a cane for more than fifteen to twenty minutes (Docket No. 12, p. 60 of 434), or stand for long periods of time without using his cane (Docket No. 12, p. 59 of 434). However, as the ALJ noted, Plaintiff also stated that he mows his "nice big backyard" (Docket No. 12, p. 58 of 434) and shovels snow (Docket No. 12, p. 63 of 434). When pressed for more specific information as to why the pain in his knees and feet prevent him from

24

working, Plaintiff responded with vague answers such as "I don't know," and "[i]t's hard to say" (Docket No. 12, p. 50 of 434).

On October 7, 2009, Dr. Castor diagnosed Plaintiff with chronic bilateral knee pain, plantar fasciitis, and right shoulder pain (Docket No. 12, p. 266 of 434). At that time, Plaintiff had a full range of motion in all his extremities, was able to touch his toes and get up and down from the exam table without assistance (Docket No. 12, p. 266 of 434). Plaintiff also stated that he could walk two blocks, stand for ten minutes, and lift five to ten pounds (Docket No. 12, p. 266 of 434). Dr. Castor noted that Plaintiff did not use a cane or any other assistive device (Docket No. 12, p. 266 of 434).

Radiology scans of Plaintiff's left knee taken during this same time showed extensive degenerative changes (Docket No. 12, p. 268 of 434). He was subsequently diagnosed with tri-compartmental degenerative changes in both knees (Docket No. 12, p. 285 of 434). Scans of Plaintiff's feet were normal (Docket No. 12, p. 286 of 434). In January 2010, Plaintiff was diagnosed with osteoarthritis in both knees, given a steroid injection, and sent for physical therapy (Docket No. 12, p. 357 of 434). Plaintiff later reported that he never went to therapy (Docket No. 12, p. 356 of 434). Furthermore, Plaintiff told staff at St. Thomas that he took Motrin *as needed*, not on a daily basis, to manage his pain (Docket No. 12, p. 356 of 434). In a symptoms report, dated December 28, 2010, Plaintiff reported that he was taking Celebrex and Advil for his physical pain, which "help me with pain in my knees and feet" (Docket No. 12, p. 200 of 434).

Plaintiff takes issue with the ALJ's notation of Plaintiff's non-compliance with treatment (Docket No. 13, p. 11 of 14). ALJ Miller stated "[f]urther dilutive of the alleged severity of this impairment is [Plaintiff's] non-compliance with treatment recommendations both conservative, in the form of physical therapy and more invasive, in the form of replacement surgery" (Docket No. 12, p. 30

of 434). The recommendation for surgery aside, Plaintiff never provided any justification as to why, if

his physical symptoms were so debilitating, he never followed through with the doctor's orders to

complete physical therapy (Docket No. 12, p. 356 of 434).

As stated above, an ALJ need not fully credit subjective complaints where there is no

underlying medical basis. *Fraley*, 733 F.2d at 440. ALJ Miller set forth adequate reasons for not

finding Plaintiff's subjective statements of pain to be fully credible. Based on a thorough examination

of the record, the Magistrate finds that Plaintiff's subjective allegations with regard to his physical

health issues are not supported by substantial evidence. Therefore, Plaintiff's second assignment of

error is without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

### 3.    HYPOTHETICAL QUESTION

Finally, Plaintiff alleges the ALJ did not meet his burden at step five of the sequential

evaluation (Docket No. 13). Specifically, Plaintiff alleges ALJ Miller's hypothetical question did not

accurately portray Plaintiff's actual limitations, thereby rendering any testimony by the VE incomplete

(Docket No. 13, p. 12 of 14). The Magistrate disagrees.

In the Sixth Circuit, in order to be considered substantial evidence, a VE's testimony must be

based on a hypothetical question which accurately portrays the claimant's physical and mental

impairments. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

However, it is also "well established that an ALJ . . . is required to incorporate only those limitations

accepted as credible by the finder of fact" into the hypothetical question. *Casey v. Sec'y of Health &*

*Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

ALJ Miller posed the following hypothetical question to the VE:

For the first hypothetical, please consider a hypothetical individual of the claimant's age,
education, work experience and the residual functional capacity to lift and/or carry up to

26

[fifty] pounds occasionally, [twenty-five] pounds frequently; stand and/or walk with normal breaks for a total of about two hours in an eight hour workday; sit with normal breaks for a total of about six hours in an eight hour workday; no ladders, ropes, or scaffolds; no foot controls or pedals; and non-exertional limitations to work that is simple, routine and repetitive in a relatively static work environment that does not involve high or fast paced production quotas where changes can be explained and involving only brief and superficial contact with the public. With these limitations, would there be any jobs?

(Docket No. 12, pp. 64-65 of 434). Plaintiff alleges the hypothetical question is incomplete, as it fails to include the limitation that the individual would be off-task eleven to twenty percent of the time, as found by Plaintiff's treating psychologist (Docket No. 13, p. 12 of 14).

Upon examination of Plaintiff's entire medical record, it is clear that there is no evidence to support Plaintiff's claim that he would need to be off-task eleven to twenty percent of the time. As noted above, aside from Dr. Ford, no physician found Plaintiff to have any more than moderate limitations in either physical or mental capabilities (Docket No. 12, pp. 214-434 of 323). An ALJ is only required to incorporate into his hypothetical question those "limitations accepted as credible by the finder of fact." *Casey*, 987 F.2d at 1235. Therefore, Plaintiff's third assignment of error is without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

## VIII. CONCLUSION

For the foregoing reasons, this Magistrate recommends the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   September 13, 2013

27

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.